# EXHIBIT A

**Supreme Court of Pennsylvania**

**Court of Common Pleas
Civil Cover Sheet**

_____WESTMORELAND_____ **County**

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name:<br>JOHN DOE, ET AL. | Lead Defendant's Name:<br>EXCELA HEALTH, ET AL. |
|---|---|

**Are money damages requested?** ☒ Yes ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☒ Yes ☐ No          **Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: _____

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/ Defamation
- ☒ Other:
  Pennsylvania Wire Tap Act
  18 Pa. C.S.A, §5725

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other _____

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other _____

- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other _____

- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i)     actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)    actions for support, Rules 1910.1 et seq.

(iii)   actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)   actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)    actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)   voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

04/11/2023 11:29 AM Westmoreland County    23CI01410

| | |
|---|---|
| JOHN DOE I AND JOHN DOE II, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA |
| Plaintiffs, | |
| EXCELA HEALTH, EXCELA HEALTH HOLDING COMPANY, INC., EXCELA HEALTH PHYSICIAN PRACTICES, INC., LATROBE AREA HOSPITAL INC., WESTMORELAND REGIONAL HOSPITAL, AND FRICK HOSPITAL. | Case No. _____ |
| Defendants. | **JURY TRIAL DEMANDED** |

## NOTICE

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Westmoreland Bar Association
100 N. Maple Avenue
Greensburg, PA 15601
Telephone: (724) 834-6730

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requier que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Westmoreland Bar Association
100 N. Male Avenue
Greensburg, PA 15601
Telephone: (724) 834 -6730

**BOCHETTO & LENTZ, P.C.**
By:     George Bochetto, Esquire
        David Heim, Esquire
        John O'Connell, Esquire
        Ryan T. Kirk, Esquire
Identification Nos.: 27783, 84323, 205527, 329492
1524 Locust Street
Philadelphia, PA 19102
(215)735-3900
(215) 735-2455 fax
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com
joconnell@bochettoandlentz.com
rkirk@bochettoandlentz.com

*Attorneys for Plaintiffs and the Proposed Class*
*[additional counsel listed on signature page]*

| | |
|---|---|
| JOHN DOE I AND JOHN DOE II, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA |
| Plaintiffs, | |
| EXCELA HEALTH, EXCELA HEALTH HOLDING COMPANY, INC., EXCELA HEALTH PHYSICIAN PRACTICES, INC., LATROBE AREA HOSPITAL INC., WESTMORELAND REGIONAL HOSPITAL, AND FRICK HOSPITAL. | Case No. _____ |
| Defendants. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe I and John Doe II, individually and on behalf of all other current

Citizens of the Commonwealth of Pennsylvania similarly situated ("Class Members"), brings suit

against Excela Health, Excela Health Holding Company, Inc., Excela Health Physician Practices,

Inc., Latrobe Area Hospital Inc., Westmoreland Regional Hospital, and Frick Hospital

(collectively "Excela Health" or "Defendants"), and upon personal knowledge as to Plaintiffs' own

04/11/2023 11:29 AM Westmoreland County    23CI01410

conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1.       This case arises from Excela Health's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2.       Excela Health assures visitors to its website that "We respect the privacy of your health information."[1] Excela Health also promises patients that it will never disclose their personal information for "marketing purposes" without patients' "written authorization."[2]

3.       Contrary to such assurances, however, Excela Health does not abide by these promises, nor does Excela Health comply with the law prohibiting such disclosures.

4.       As recently as February 8, 2023, Excela Health disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

5.       Excela Health disclosed this personal health information through the deployment of various digital marketing and data collection tools embedded on its websites that purposefully and intentionally discloses patients' personal health information to third parties who exploit that information for advertising purposes. Excela Health's use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Excela Health to be automatically redirected to third parties in violation of those patients'

---

[1] https://www.excelahealth.org/documents/Notice-Priv-Practices-EXC-9500-009_Rev-8-21_334973.pdf.
[2] https://www.excelahealth.org/documents/Notice-Priv-Practices-EXC-9500-009_Rev-8-21_334973.pdf

04/11/2023 11:29 AM Westmoreland County    23CI01410

reasonable expectations of privacy, their rights as patients, their rights as citizens of Pennsylvania, and both the express and implied promises of Excela Health.

6.      Excela Health's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Pennsylvania law, including, but not limited to, 18 Pa. C.S. §§5701 *et seq* (the Wiretapping and Electronic Surveillance Control Act), 28 Pa. Code § 115.27 (Confidentiality of Medical Records), 49 Pa. Code § 16.61(a)(1) (Unprofessional and Immoral Conduct), and the duty of physician-patient confidentiality recognized in *Haddad v. Gopal*, 787 A.2d 975, 980 (Pa. Super. 2001).

7.      On behalf of themselves and all similarly situated citizens in the Commonwealth of Pennsylvania, Plaintiffs seek an order enjoining Excela Health from further unauthorized disclosures of their personal information; awarding statutory damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

8.      Defendant Excela Health is a Pennsylvania corporation with its principal place of business at 532 West Pittsburgh Street, Greensburg, PA 15601.

9.      Defendant Excela Health Holding Company, Inc. is a Pennsylvania corporation with its principal place of business at 532 West Pittsburgh Street, Greensburg, PA 15601.

10.     Defendant Excela Health Physician Practices, Inc. is a Pennsylvania corporation with its principal place of business at 532 West Pittsburgh Street, Greensburg, PA 15601.

11.     Defendant Latrobe Area Hospital Inc. is a Pennsylvania corporation with its principal place of business at One Mellon Way, Latrobe, PA 45650.

04/11/2023 11:29 AM Westmoreland County    23CI01410

12.    Defendant Westmoreland Regional Hospital is a Pennsylvania corporation with its principal place of business at 532 W. Pittsburgh Street, Greensburg, PA 15601.

13.    Defendant Frick Hospital is a Pennsylvania corporation with its principal place of business at 508 S. Church St., Mt. Pleasant, PA 15666.

14.    The above-listed Defendants do business collectively throughout the Commonwealth of Pennsylvania as "Excela Health."

15.    Plaintiff, John Doe I, is a Pennsylvania citizen residing in Westmoreland County, Pennsylvania who has been a patient of Excela Health's.

16.    Plaintiff, John Doe II, is a Pennsylvania citizen residing in Westmoreland County, Pennsylvania who has been a patient of Excela Health's.

## JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over Excela Health pursuant to 42 Pa.C.S.A. §§ 5301, 5308, and 5322 because it regularly conducts continuous and systematic business throughout the Commonwealth of Pennsylvania, have engaged in acts that have caused harm in this Commonwealth, have violated the statutes of this Commonwealth, and/or are formed under the laws of this Commonwealth.

18.    Venue is appropriate in Westmoreland County pursuant to Pa R.C.P. 1006, 2130, 2156, and 2179 because Excela Health's principal place of business is in Westmoreland County and Excela Health regularly conducts business in Westmoreland County, and, upon information and belief, many of the acts or conduct giving rise to the cause of action asserted herein took place in Westmoreland County. Venue is also appropriate in this Court because Plaintiffs John Doe I and John Doe II reside in Westmoreland County.

## FACTUAL BACKGROUND

04/11/2023 11:29 AM Westmoreland County    23CI01410

04/11/2023 11:29 AM Westmoreland County    23CI01410

**A.      Excela Health routinely discloses the protected health information of its patients to third parties including Facebook.**

19.      Plaintiff John Doe I is a patient of Excela Health's who has received treatment from Excela Health's hospital facilities, including Latrobe Hospital and Westmoreland Hospital.[3]

20.      Plaintiff John Doe II is a patient of Excela Health's who has received treatment from Excela Health's hospital facilities, including Frick Hospital, Latrobe Hospital, and Westmoreland Hospital.[4]

21.      Pennsylvania courts have long recognized a "right to privacy" in the Constitution of the Commonwealth.[5] The Pennsylvania Supreme Court, in fact, has held that the Pennsylvania Constitution "provides even more rigorous and explicit protections for a person's right to privacy than does the United States Constitution."[6]

22.      Medical patients in Pennsylvania such as John Doe I and John Doe II have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Excela Health without their express written consent and authorization.[7]

23.      As a health care provider, Excela Health has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

---

[3] https://www.excelahealth.org/locations/
[4] https://www.excelahealth.org/locations/
[5] *See, e.g., Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Cmty. & Econ. Dev.*, 637 Pa. 337, 340, 148 A.3d 142, 144 (2016)
[6] *See id.* at 352-353 (internal quotations omitted).
[7] *See, e.g., In re T.R.*, 557 Pa. 99, 105, 731 A.2d 1276, 1279 (1999) (recognizing constitutional "right to privacy" protects a citizen's interest in "avoiding disclosure of personal matters."); *In re "B"*, 482 Pa. 471, 486, 394 A.2d 419, 426 (1978) (barring disclosure of a patient's "psychiatric records" under the constitutional right to privacy.)

04/11/2023 11:29 AM Westmoreland County    23CI01410

24.     Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are protected against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

25.     Excela Health expressly and impliedly promises patients that they will maintain and protect the confidentiality of personally identifiable patient information and communications.

26.     Patients rely on these promises, obligations, and protections when seeking medical care.

27.     Patients also have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Excela Health without their express written consent and authorization.

28.     Excela Health operates the website https://www.excelahealth.org/ for patients.

29.     Excela Health's website is designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

30.     Excela Health encourages patients to use digital tools on its website to seek and receive health services.  The home page of Excela Health's website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Excela Health's services.

31.     Excela Health also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers.

32.     Notwithstanding patients' reasonable expectations of privacy, Excela Health's legal duties of confidentiality, and Excela Health's express promises to the contrary, Excela Health

discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Excela Health without patients' knowledge, authorization, or consent. In doing so, Excela Health systematically violated the medical privacy rights of its patients by causing the unauthorized disclosure of patient communications to be transmitted to Facebook, Google, and other third-party marketing companies.

33.    While Excela Health intentionally incorporated tracking technology into its website, Excela Health never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications with Facebook, Google, and others. As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to third parties when they visited Excela Health's website.

34.    By design, none of the tracking mechanisms employed by Excela Health are visible to patients visiting Excela Health's website.

35.    Excela Health did not warn or otherwise disclose to Plaintiffs and Class Members that Excela Health bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

36.    Plaintiffs and Class Members never consented, agreed, or otherwise authorized Excela Health to disclose their confidential medical communications, particularly not beyond the limits of Excela Health's express promises to protect the confidentiality of Plaintiffs' and Class Members' private information.

37.    Upon information and belief, Excela Health intercepted and disclosed the following non-public private information to Facebook:

a.    Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Member's communications with Excela Health via its website;

c. Plaintiffs' and Class Members' use of Excela Health's patient portal;

d. Plaintiffs' and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

38.    Excela Health interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including the Meta Pixel) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential information to Facebook, Google, and other third parties.

39.    Excela Health also breached its obligations to Plaintiffs and Class Members in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Excela Health was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Excela Health's common and statutory obligations to protect the confidentiality of patient's protected health information.

40.    Plaintiffs and Class Members have suffered injury because of Excela Health's conduct. Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B.    The nature of Excela Health's unauthorized disclosure of patients' health care information.**

04/11/2023 11:29 AM Westmoreland County    23CI01410

04/11/2023 11:29 AM Westmoreland County    23CI01410

41.     Excela Health's disclosures of patients' personal healthcare information occur because Excela Health intentionally deploys source code on the websites they operate, including https://www.excelahealth.org/, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

42.     By design, these third parties receive and record the exact contents of patient communications before the full response from Excela Health to patients has been rendered on the screen of the patient's computer device and while the communication between Excela Health and the patient remains ongoing.

43.     For example, when Plaintiffs or a Class Member accessed Excela Health's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.  The information that Excela Health sent to Facebook included the private information that Plaintiffs and Class Members communicated to Excela Health's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.  Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

44.     Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer.

45.     Websites like those maintained by Excela Health are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

46.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

47.     Web browsers are software applications that allow users to exchange electronic communications over the internet.

48.     Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server.  When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

49.     In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

50.     In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

51.     A web page consists primarily of "Markup" and "Source Code."  The markup of a web page comprises the visible portion of that web page.  Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen.  The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

04/11/2023 11:29 AM Westmoreland County    23CI01410

52.    For example, typing https://www.excelahealth.org/ into a browser sends an HTTP request to Excela Health's website, which returns a HTTP response in the form of the home page of Commonwealth's website:



53.    Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Excela Health's website, to third parties via pixels.

54.    For example, Excela Health's website includes software code that transmits HTTP requests *directly* to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

55.    The basic command that web browsers use to exchange data and user communications is called a GET request.[8]    For example, when a patient types "heart failure

---

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

treatment" into the search box on Excela Health's website and hits 'Enter,' the patient's web browser makes a connection with the server for Excela Health's website and sends the following request: "GET search/q=heart+failure+treatment."

56.      When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user.  For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

57.      The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

58.      In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

59.      Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

60.      Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third party tracking tools.  Indeed, Google warns website

04/11/2023 11:29 AM Westmoreland County    23CI01410

developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[9]

61.    Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

62.    In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

63.    Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

64.    Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

65.    Excela Health deploys Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Excela Health's website that is, in reality, an invisible window through which Excela Health funnels tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

66.    Excela Health's Google Tag Manager source code is designed to be invisible.  The source code employed by Excela Health specifies an "iframe" with a height of 0, width of 0, display of none, and visibility hidden.

---

[9] https://support.google.com/platformspolicy/answer/6156630?hl=en

04/11/2023 11:29 AM Westmoreland County    23CI01410

67.    Excela Health then funnels invisible 1x1 tracking pixels or web-bugs through this purposely invisible iframe to help third parties track, acquire, and record patient data and communications.

68.    By design, none of the tracking is visible to patients visiting Excela Health's website.

69.    These tracking pixels can collect dozens of data points about individual website users who interact with a website.  For example, when a patient clicks through Excela Health's website to the page describing Excela Health's "Urology" services at https://www.excelahealth.org/services/urology/, the source code deployed on Excela Health's website causes personally identifiable data and the content of patient communications to be transmitted to third parties:



70.    By design, the transmission of patient data to third parties occurs before Excela Health's responsive communications about "Urology" has been delivered in full to the patient.

71.    In addition to the Google Tag Manager, other source code is also placed on Excela Health's website, resulting in the interception and transmission of patient personal health information to multiple third parties.

72.    A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

73.    For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook. Tracking pixels such as the Meta Pixel tool allow Excela Health and Facebook to secretly track, intercept, record, and transmit every patient communication made on Excela Health's website.  When patients visit Excela Health's website, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Excela Health's website.  This code is triggered when a patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends patient's private information directly to Facebook.

74.    The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed.  Instead, these pixels like in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

75.    For example, a patient can trigger an HTTP request by interacting with the search bar on Excela Health's website by typing a term such as "breast cancer" into the search bar and

15

then hitting enter. Excela Health's server in turn sends an HTTP response, which results in the search results being displayed.

76.     This is not the only HTTP request, however, that is created by a patient's interaction with Excela Health's website. In fact, at the very same time the web page is instructed to send an HTTP request to Excela Health requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that Excela Health's website is also instructed to send an HTTP request directly to Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

**C.     Tracking pixels provide third parties with a trove of personally identifiable information.**

77.     Tracking pixels are especially pernicious because they result in the disclosure of a variety of personally identifiable information.

78.     For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices— one that has limited privacy controls.[10]

79.     Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information. 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

80.     Likewise, internet cookies also provide personally identifiable information. 45 CFR § 164.514.

---

[10] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

81.    In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

82.    Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

83.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

84.    Cookies are considered personally identifiable information, and tracking pixels can collect cookies from website visitors.

85.    In general, cookies are categorized by (1) duration and (2) party.

86.    There are two types of cookies classified by duration.

87.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

88.     "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

89.     Cookies are also classified by the party that uses the collected data.

90.     "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

91.     "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Excela Health's website will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

92.     Data companies like Facebook have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits.  To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

93.     Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Excela Health can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a

04/11/2023 11:29 AM Westmoreland County    23CI01410

patient's communications, Excela Health is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Excela Health. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

94.    JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Excela Health can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

95.    In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

96.    The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

97.    The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their

communications with non-Facebook entities while the person is on a non-Facebook website or app.

98.    Excela Health requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

99.    The _fbp cookie is used as a unique identifier for patients by Facebook.

100.    If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie.  Facebook also uses IP addresses and user-agent information to match the health information it receives from Excela Health with Facebook users.

101.    Excela Health engages in cookie synching with Facebook, Google, and other third parties.

102.    Excela Health's cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Excela Health assigns to patients to also be made to third parties.

103.    Excela Health uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

104.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

105.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety

20

04/11/2023 11:29 AM Westmoreland County    23CI01410

of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[11] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[12]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[13]

106.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[14]

107.    Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

108.    Excela Health uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

109.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.[15]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[16]

---

[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://pixelprivacy.com/resources/browser-fingerprinting/
[13] https://www.blog.google/products/chrome/building-a-more-private-web/
[14] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[15] https://www.facebook.com/help/211813265517027
[16] https://smallseotools.com/find-facebook-id/

04/11/2023 11:29 AM Westmoreland County    23CI01410

110.    Unique personally identifiable information such as a person's Facebook ID are likewise capable of collection through pixel trackers.

111.    Each of the individual data elements described above is personally identifiable on their own.  However, Excela Health's disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D.    Facebook's Business Model: Exploiting Users' Personal Data to Sell Advertising.**

112.    Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

113.    Facebook describes itself as a "real identity" platform.[17]  This means that users are permitted only one account and must share "the name they go by in everyday life."[18]  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[19]

114.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[20]  Facebook has since evolved into one of the largest advertising companies in the world.[21]  Facebook can target users so effectively because it surveils user activity

---

[17] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[18] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[19] https://www.facebook.com/help/406644739431633
[20] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[21] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

04/11/2023 11:29 AM Westmoreland County    23CI01410

both on and off its website through the use of tracking pixels.[22]  This allows Facebook to make inferences about users based on their interests, behavior, and connections.[23]

115.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network.  Facebook has more than 2.9 billion users.[24]

116.    Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications.  These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers.  Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

117.    Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers.  Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites.  Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

118.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target.  Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."  Each of Facebook's advertising tools allow an advertiser to target

---

[22] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[23] https://www.facebook.com/business/ads/ad-targeting
[24] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

04/11/2023 11:29 AM Westmoreland County    23CI01410

users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

119.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[25] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

120.    Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

121.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

122.    Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that

---

[25] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**E.    Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

123.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

124.    One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Excela Health installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[26]

125.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[27] Once activated, the Meta Pixel "tracks the people and type of actions they take."[28] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[29] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website.[30] The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.[31]

---

[26] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[27] https://developers.facebook.com/docs/meta-pixel/
[28] https://www.facebook.com/business/goals/retargeting
[29] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[30] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[31] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

04/11/2023 11:29 AM Westmoreland County    23CI01410

126.    When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

127.    In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law.  This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

128.    The information Meta Pixel captures and disclose to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[32]  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them.  Thus, the URL provides significant information regarding a user's browsing

---

[32] *In re Facebook*, 956 F.3d at 596.

04/11/2023 11:29 AM Westmoreland County    23CI01410

history, identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

129.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[33]  This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

130.    The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

131.    The transmission is invisible.

132.    The transmission is made without any affirmative action taken by the patient.

133.    The transmission occurs without any notice to the patient that it is occurring.

134.    Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

135.    The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[34]  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and

---

[33] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).
[34] *In re Facebook*, 956 F.3d at 596.

04/11/2023 11:29 AM Westmoreland County     23CI01410

where to find them.  Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

136.   These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform.  In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[35]

137.   For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data.  All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

138.   These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible.  Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[36]

139.   In exchange for installing its Meta Pixel, Facebook provides website owners like

---

[35] *In re Facebook*, 956 F.3d at 596.
[36] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

Excela Health with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[37]  The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[38]

140.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

141.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[39]  According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[40]

142.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[41]

143.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[42]

144.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional

---

[37] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[38] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[39] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[40] https://www.oviond.com/understanding-the-facebook-pixel
[41] https://developers.facebook.com/docs/meta-pixel/get-started
[42] https://developers.facebook.com/docs/meta-pixel/get-started

04/11/2023 11:29 AM Westmoreland County    23CI01410

04/11/2023 11:29 AM Westmoreland County    23CI01410

values" set by the business website.[43]  Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID.  Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

145.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[44]

146.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.  The information is sent in data packets, which include personally identifiable data.

147.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[45]  HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[46]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[47]

148.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[48]

---

[43] https://developers.facebook.com/docs/meta-pixel/
[44] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[45] https://developers.facebook.com/docs/meta-pixel/
[46] https://developers.facebook.com/docs/meta-pixel/
[47] https://developers.facebook.com/docs/meta-pixel/
[48] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

149.    Facebook has a number of ways to gather personally identifiable information from individuals whose data is being forwarded from third-party websites through the Meta Pixel.

150.    If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

151.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[49]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[50]

152.    Facebook can also link user data to Facebook accounts through information collected through Meta Pixel through what Facebook calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.[51]  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

153.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[52]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel

---

[49] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[50] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[51] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[52] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

04/11/2023 11:29 AM Westmoreland County    23CI01410

data to Facebook profiles.[53]

154.    Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

155.    Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

156.    The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

157.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[54] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and

---

[53]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[54] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

04/11/2023 11:29 AM Westmoreland County    23CI01410

associated with Excela Health's use of the Facebook Tracking Pixel program. The fbp cookie emanates from Excela Health's web properties but is transmitted to Facebook through cookie syncing technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[55]

158.    Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.capitalhealth.org, and target users with advertising based on their web activity.

**D.    Excela Health has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

159.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

160.    Facebook's intrusion into the personal data of visitors to third-party websites

---

[55] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

04/11/2023 11:29 AM Westmoreland County    23CI01410

incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[56] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

161. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[57] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[58] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

162. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[59] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[60]

163. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making

---

[56] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[57] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[58] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[59] https://instapage.com/blog/meta-pixel
[60] https://instapage.com/blog/meta-pixel

an appointment, that condition is also transmitted to Facebook through Meta Pixel.

164.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time.  Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

165.    Excela Health is among the hospital systems who have embedded Meta Pixel on their websites.  Via its use of the Meta Pixel, Excela Health intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Excela Health, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, or Enroll in Excela Health's patient portal, summaries of Excela Health's responsive communications, the parties to the communications, and the existence of communications at Excela Health's websites.

166.    For example, when a patient visits the homepage of Excela Health's website, the source code employed by Excela Health causes personally identifiable information to be transmitted to Facebook.

167.    Likewise, when a patient enters their personal information through Excela Health's websites that incorporate Meta Pixel, such as to locate a doctor, this information, including what the patient is being treated for, those communications are simultaneously disclosed to Facebook via the Meta Pixel.  The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

04/11/2023 11:29 AM Westmoreland County    23CI01410



168.    This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifiable and health information is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

169.    As recently as February 8, 2023, all this data was disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts.   Excela Health also disclosed other personally identifiable information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, URLs, device identifiers, and other unique identifiable characteristics and/or codes.

170.    Excela Health disclosed such personally identifiable information and sensitive medical information even when patients are searching for doctors on its websites to assist with conditions such as cancer or pregnancy.

04/11/2023 11:29 AM Westmoreland County    23CI01410





171. In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Excela Health is not sharing with third party marketing companies.

172. Excela Health discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Excela Health, communications

04/11/2023 11:29 AM Westmoreland County    23CI01410

made by patients using the website's Bill Pay/Financials function, communications made when patients access Excela Health's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

173.    As the above demonstrates, knowing what information a patient is reviewing on Excela Health's website can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Excela Health's website allows Meta Pixel to capture that search term and tell Facebook that the patient is likely pregnant.  Indeed, Facebook might learn that the patient is pregnant before the patient's close family and friends.   But there is nothing visible on Excela Health's website that would indicate to patients that, when they use Excela Health's search function, their personally identifiable data and the precise content of their communications with Excela Health are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

174.    The amount of data collected is significant.  Via the Meta Pixel, when patients interact with its website, Excela Health discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested.  For example, when a patient types a search term into the search bar on Excela Health's website, the website returns links to information relevant to the search term.  When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

175.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and

04/11/2023 11:29 AM Westmoreland County    23CI01410

even the type of browser used.  In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient.  The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

176.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Excela Health's websites.  The path identifies where a file can be found on a website.  For example, for https://www.excelahealth.org/find-a-doctor/ryan-k-abegglen-md/, the "path" is find-a-doctor/ryan-k-abegglen-md.  Similarly, a patient reviewing information about "Services" that Excela Health offers patients such as "Urology" will generate a URL with the path https://www.excelahealth.org/services/urology/.

177.    Likewise, a query string provides a list of parameters.  An example of a URL that provides a query string is https://www.excelahealth.org/site-search/?C=cancer.  The query string parameters in this search indicate that a search was done at the Excela Health website for information about cancer.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

178.    The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Excela Health's website.  Worse, no matter how sensitive the area of the Excela Health's website that a patient reviews, the referral URL is acquired by Facebook along with personally identifiable information.

179.    The nature of the collected data is also important.  Excela Health's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition.  Facebook is then able to correlate

04/11/2023 11:29 AM Westmoreland County    23CI01410

that history with the time of day and other user actions on Excela Health's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

180.    Excela Health also discloses the same kind of patient data described above to other third parties, including Google Ads, Google Tag Manager, Google Analytics, Google Double Click, Scorpion Marketing, and Option Monster via tracking software that Excela Health has installed on its website. As with the Facebook Meta Pixel, Excela Health provides patients and prospective patients with no notice that Excela Health is disclosing the contents of their communications to these third parties. Likewise, Excela Health does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

181.    These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[61] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Excela Health routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

182.    Google cookies provide personally identifiable data about patients who visit Excela Health's website to Google. Excela Health transmits personally identifiable Google cookie data to Google.

183.    Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a

---

[61] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

04/11/2023 11:29 AM Westmoreland County    23CI01410

prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

184.    Excela Health deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Excela Health and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, payments, and registrations and logins to Excela Health's patient portal.

185.    By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Excela Health knowingly discloses information that allows Facebook and other advertisers to link its patients' personal health information to their private identities and target them with advertising.    Excela Health intentionally shares the personal health information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

186.    Excela Health facilitated the disclosure of Plaintiffs' Personal Health information, including sensitive medical information, to Facebook without their consent or authorization when they entered information on the websites that Excela Health maintains.

187.    For example, Plaintiffs John Doe I and John Doe II have visited Excela Health's website periodically at https://www.excelahealth.org/ and entered data, including sensitive medical information, such as details about their medical condition and doctor.    The information that Plaintiffs transmitted included queries about potential physician(s) and treatment(s) for their medical condition.    Plaintiffs believed that their interactions with Excela Health's website were private and would not be shared with anyone besides their healthcare providers.    Plaintiffs were

dismayed when they learned that Excela Health's website had been capturing their personal health information and disclosing that information to Facebook and Google without their consent.

188.    Because Excela Health embedded the Meta Pixel on its website, Excela Health disclosed intimate details about Plaintiffs' interactions with its website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity. For example, when Plaintiffs and Class Members visited Excela Health's website, their personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms. During these same transmissions, Excela Health's website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect patients' privacy.

189.    Excela Health knew that by embedding Meta Pixel—a Facebook advertising tool— it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. Excela Health was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Excela Health made the decision to barter its patients' personal health information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Excela Health and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**F.    Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

04/11/2023 11:29 AM Westmoreland County    23CI01410

190.    Plaintiffs and Class Members had no idea when they interacted with Excela Health's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook.  That is because, among other things, Meta Pixel is secretively and seamlessly integrated into Excela Health's websites and is invisible to patients visiting those websites.

191.    For example, when Plaintiffs visited Excela Health's website at https://www.excelahealth.org/ there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook.

192.    Plaintiffs and their fellow Class Members could not consent to Excela Health's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

193.    While Excela Health purports to have privacy policies and notices, the links to those policies and notices are buried at the very bottom of the home page of Excela Health's website, so as to be effectively hidden from patients:[62]

---

[62] https://www.excelahealth.org/



04/11/2023 11:29 AM Westmoreland County    23CI01410

194.    Even if a patient visiting Excela Health's website could locate Defendants' "Notice of Privacy Practices" or "Privacy Policy," nothing in any of those pages would be understood by any reasonable patient to mean that Excela Health's website routinely captures and exploits patients' personal health information, including by sharing that information with Facebook.[63]

195.    Indeed, neither Excela Health's Notice of Privacy Practices nor its Privacy Policy mentions the Meta Pixel.  What's more, Excela Health's Notice of Privacy Practices expressly states that "We respect the privacy of your health information" and that "uses and disclosures" of personal health information for "for marketing purposes" will require patients' "written authorization."[64]

196.    These statements are false, deceptive, and misleading in light of Excela Health's secret disclosure of patient information to numerous third parties, including Facebook and Google.

---

[63] https://www.excelahealth.org/documents/Notice-Priv-Practices-EXC-9500-009_Rev-8-21_334973.pdf;
https://www.excelahealth.org/privacy-policy/.
[64] https://www.excelahealth.org/documents/Notice-Priv-Practices-EXC-9500-009_Rev-8-21_334973.pdf.

04/11/2023 11:29 AM Westmoreland County    23CI01410

Excela Health's privacy policy is also false, deceptive, and misleading because Excela Health in fact routinely sells and/or barters their patients' personal health information to Facebook without patients' knowledge or consent in return for access to the Meta Pixel tool.

197.    What's more, the very term "Privacy Policy" is deceptive. Research has consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot (and will not) disclose information about them to third parties without their consent.

198.    Excela Health does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.,* 71 P.S. § 1690.108; 45 C.F.R. § 164.508.  Nor is Excela Health permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients.  28 Pa. Code § 115.27; 31 Pa. Code § 146b.12(a).

199.    Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data.[65]

200.    Excela Health failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

201.    A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous

---

[65] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

privacy policy hidden away on a company's website.  Further, Excela Health expressly promised its patients that it would never sell or use their personal health information without express authorization.

202.    Accordingly, Excela Health lacked authorization to intercept, disclose to Facebook, or use Plaintiffs and Class Members' personal health information, or to procure others (such as Facebook) to intercept, disclose, or use such personal health information.

**G.    Excela Health's disclosures of personal patient data to Facebook are unnecessary.**

203.    There is no information anywhere on the websites operated by Excela Health that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook.  Nor are any of the disclosures of patient personal health information to Facebook necessary for Excela Health to maintain its healthcare website or provide medical services to patients.

204.    For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments.  It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.  Likewise, it is possible for Excela Health to provide medical services to patients without sharing their personal health information with Facebook so that this information can be exploited for advertising purposes.

205.    Despite these possibilities, Excela Health willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Excela Health, to third-parties, including Facebook.

**H.    Plaintiffs and Class Members have a reasonable expectation of privacy in their**

04/11/2023 11:29 AM Westmoreland County    23CI01410

**personal health information, especially with respect to sensitive medical information.**

206.    Patient personal health information is specifically protected by law.  *E.g.* 28 Pa. Code § 115.27; 28 Pa. Code § 563.9; 28 Pa. Code § 710.23.  The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes.  *E.g.* 49 Pa. Code § 16.61(a)(1); 45 C.F.R. § 164.514.  Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

207.    Plaintiffs and Class Members have a reasonable expectation of privacy in their personal health information, including personally identifiable data and sensitive medical information.  Excela Health's surreptitious interception, collection, and disclosure of patients' personal health information to Facebook violated Plaintiffs and Class Member's privacy interests.

208.    As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their personal health information to third parties without their express authorization.

209.    The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[66]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.  For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for

---

[66] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

23CI01410

04/11/2023 11:29 AM Westmoreland County

trust….Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[67]

210.    The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [68]

211.    Plaintiffs' and Class Members' reasonable expectations of privacy in their personal health information are grounded in, among other things, Excela Health's status as a health care provider, Excela Health's common law obligation to maintain the confidentiality of patients' personal health information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Excela Health's express and implied promises of confidentiality.

212.    It was reasonable for Plaintiffs and Class Members to assume that Excela Health's privacy policies were consistent with Excela Health's duties to protect the confidentiality of patients' personal health information.

213.    Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

---

[67] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[68] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

23CI01410

04/11/2023 11:29 AM Westmoreland County

214.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

215.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[69]

216.    Users act consistently with these preferences.  For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[70]

217.    "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

218.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access

---

[69] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[70] https://www.wired.co.uk/article/apple-ios14-facebook

04/11/2023 11:29 AM Westmoreland County    23CI01410

to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[71]

219.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook.  As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

## I.    Plaintiffs' Personal Health Data that Excela Health collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.

220.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Excela Health has collected and disclosed from Plaintiffs and Class Members.

221.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[72]

222.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about

---

[71] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[72] https://ig.ft.com/how-much-is-your-personal-data-worth/

04/11/2023 11:29 AM Westmoreland County    23CI01410

"$0.30" per name.[73]  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[74]

223.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[75]  This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[76]

224.    Despite the protections afforded by law, there is an active market for health information.  Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[77]

225.    Further, individuals can sell or monetize their own data if they so choose.  For example, Facebook has offered to pay individuals for their voice recordings,[78] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[79]

226.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi,

---

[73] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[74] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[75] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[76] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[77] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also* https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[78] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounuanciations-app
[79] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

04/11/2023 11:29 AM Westmoreland County    23CI01410

and UpVoice also offer consumers money in exchange for access to their personal data.[80]

227.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Excela Health has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**J.    Excela Health is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

228.    In exchange for disclosing personal health information about its patients, Excela Health is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

229.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels.  Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

230.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.  Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network.  The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

231.    Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Excela Health loses the ability to control how that

---

[80] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

information is subsequently disseminated and exploited.

232.   The monetization of the data being disclosed by Excela Health, both by Excela Health and Facebook, demonstrates the inherent value of the information being collected.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

233.   The applicable statutes of limitation have been tolled as a result of Excela Health's knowing and active concealment and denial of the facts alleged herein.

234.   Excela Health seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Excela Health had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

235.   Meta Pixel is purposefully designed and integrated in a way that makes it impossible to identify with the naked eye and its presence can only be discovered through means significantly more sophisticated than possessed by the average internet user.

236.   Plaintiffs and Class Members could not with due diligence have discovered the full scope of Excela Health's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

237.   Further, Plaintiffs and Class Members were not on notice to look for the Meta Pixel, and Excela Health's overt representations assured them that their personal information was being treated in a confidential manner.

238.   All applicable statutes of limitation have also been tolled by operation of the discovery rule, Excela Health's fraudulent concealment, and the doctrine of continuing tort.

23CI01410

04/11/2023 11:29 AM Westmoreland County

04/11/2023 11:29 AM Westmoreland County    23CI01410

Excela Health's illegal interception and disclosure of patients' personal health information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Excela Health was under a duty to disclose the nature and significance of their data collection practices but did not do so. Excela Health is therefore estopped from relying on any statute of limitations defenses.

### CLASS ACTION ALLEGATIONS

239.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

240.    Excela Health's conduct violates the law, its duty of confidentiality, its express and implied promises, and Plaintiffs' and Class Members' right to privacy.

241.    Excela Health's unlawful conduct has injured Plaintiffs and Class Members.

242.    Excela Health's conduct is ongoing.

243.    Plaintiffs bring this action individually and as a class action against Excela Health.

244.    Plaintiffs seek class certification for the following proposed Class:

> **The Excela Health Class:** During the fullest period allowed by law, all current Pennsylvania citizens who are, or were, patients of Excela Health, or any of its affiliates and who exchanged communications at Excela Health's websites, including https://www.excelahealth.org/, and any other Excela Health affiliated website, including Excela Health's patient portal.

245.    Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Excela Health, Excela Health's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Excela Health or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Excela Health's counsel.

246.    Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

04/11/2023 11:29 AM Westmoreland County    23CI01410

247.     Plaintiffs seek certification of this matter as a class action pursuant to Pennsylvania Rules of Civil Procedure § 1701 *et seq.*

248.     **Numerosity:**  While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Pennsylvania, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Excela Health.

249.     **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a.      Whether Excela Health's acts and practices violated Plaintiffs and Class Members' privacy rights;

b.      Whether Excela Health's acts and practices violate 18 Pa. C.S. § 5703(1)-(3);

c.      Whether Excela Health's acts and practices violate 28 Pa. Code § 115.27;

d.      Whether Excela Health's acts and practices violate 49 Pa. Code § 16.61(a)(1);

e.      Whether Excela Health's acts and practices violate the duty of doctor-patient confidentiality recognized in *Haddad v. Gopal*, 787 A.2d 975, 980 (Pa. Super. 2001);

f.      Whether Excela Health's acts and practices violate 55 Pa. Code § 5100.37;

g.      Whether Excela Health's acts and practices violate 28 Pa. Code § 710.23;

h.      Whether Excela Health's acts and practices violate 71 P.S. §§ 1690.108(b)(1) & (b)(2);

i.      Whether Excela Health's acts and practices violate 50 P.S. § 7111;

j.      Whether Excela Health knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' personal health information to Facebook and other third parties;

04/11/2023 11:29 AM Westmoreland County    23CI01410

k.      Whether Excela Health's acts and practices constitute a breach of fiduciary duty;

l.      Whether Excela Health's acts and practices were intentional;

m.      Whether Excela Health profited from disclosures of Plaintiffs' and Class Members' personal health information to third parties;

n.      Whether Excela Health profited from disclosures of patient personal health information to third parties including Facebook;

o.      Whether Excela Health was unjustly enriched;

p.      Whether Excela Health's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

q.      Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

r.      Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

250.    These common questions of law and fact predominate over any questions affecting only the individual Class Members.

251.    Excela Health engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

252.    **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members.  Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class.  Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Excela Health who used the websites set up by Excela Health for patients and are victims of Excela Health's respective unauthorized disclosures

to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Excela Health's wrongful conduct and unauthorized disclosures.

253.    **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

254.    **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Excela Health, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other financial detriment suffered individually by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Excela Health, making it impractical for Class Members to individually seek redress for Excela Health's wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Excela Health or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a

57

23CI01410

04/11/2023 11:29 AM Westmoreland County

class action is not permitted, Class Members will continue to suffer losses and Excela Health's misconduct will continue without proper remedy.

255.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Excela Health, electronically or by publication, the cost of which is properly imposed on Excela Health.

256.    For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Violation of Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. C.S. § 5701 *et seq* (On Behalf of Plaintiffs and the Class)

257.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

258.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

259.    All conditions precedent to this action have been performed or have occurred.

260.    WESCA prohibits any person from:

a.    intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

b.    intentionally disclosing or endeavoring to disclose to any other person the contents of any wire, electronic or oral communication, if that person knows or has reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

c.    intentionally using or endeavoring to use the contents of any wire, electronic or oral communication, if that person knows or has reason to know that the information was obtained through the interception of a wire, electronic or oral communication.

58

261.    Any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of WESCA "shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725.

262.    Excela Health qualifies as a person under the WESCA. *See* 18 Pa. C.S. §5702.

263.    Excela Health has engaged in, and continues to engage in, intentionally intercepting, endeavoring to intercept, or procuring other person(s), including at least Facebook, to intercept or endeavor to intercept, the contents of alleged wire or electronic communications between Plaintiffs or Class Members and Excela Health.

264.    In addition, or in the alternative, Excela Health has engaged in, and continues to engage in, intentionally disclosing or endeavoring to disclose to other person(s), including at least Facebook, the contents of wire or electronic communications between Plaintiffs or Class Members and Excela Health, even though Excela Health person knows, or at least has reason to know, that the information was obtained through the interception of wire or electronic communications between Plaintiffs or Class Members and Excela Health.

265.    In addition, or in the alternative, Excela Health has engaged in, and continues to engage in, intentionally using or endeavoring to use the contents of wire or electronic communications between Plaintiffs or Class Members and Excela Health, even though Excela Health person knows, or at least has reason to know, that the information was obtained through the interception of wire or electronic communications between Plaintiffs or Class Members and Excela Health.

266.    All parties to the communications between Plaintiffs or Class Members and Excela Health alleged herein have not given prior consent to such interception because Plaintiffs

04/11/2023 11:29 AM Westmoreland County    23CI01410

23CI01410

04/11/2023 11:29 AM Westmoreland County

or Class Members, as parties to said communications, never gave such consent. *See* 18 Pa. C.S. §5704(4).

267.    Plaintiffs and Class Members reasonably expected that their personal health information was not being intercepted, recorded, and disclosed to Facebook, Google, and other third parties.

268.    No legitimate commercial purpose was served by Excela Health's willful and intentional disclosure of Plaintiffs' and Class Members' personal health information to Facebook, Google, and other third parties.  Neither Plaintiffs nor Class Members consented to the disclosure of their personal health information by Excela Health to Facebook and other third parties.  Nor could they have consented, given that Excela Health never sought Plaintiffs' or Class Members' consent, much less told visitors to its website that their every interaction was being recorded and transmitted to third parties via tracking tools.

269.    Under the WESCA, aggrieved persons such as Plaintiffs or Class Members are entitled to recover from Excela Health:

    a.  actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher;

    b.  punitive damages; and

    c.  a reasonable attorney's  fee and other litigation disbursements reasonably incurred.

270.    In addition to statutory damages, Excela Health's breach caused Plaintiffs and Class Members the following damages:

    a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.  Excela Health eroded the essential confidential nature of the doctor-patient relationship;

04/11/2023 11:29 AM Westmoreland County    23CI01410

c.   Excela Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

271.   Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

WHEREFORE, Plaintiffs on behalf of themselves and their fellow Class Members respectfully requests this Honorable Court to enter judgment against Excela Health in excess of $1 million, together with all other compensatory, declaratory and injunctive relief, punitive damages, pre- and post-judgment interest, attorney's fees, costs of suit, and other such relief as the Court deems just and proper.

**COUNT II**
**Invasion of Privacy—Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

272.   Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

273.   Plaintiffs bring this claim on behalf of themselves and all members of the Class.

274.   Pennsylvania law expressly recognizes that patients have a right to every consideration of privacy concerning their medical records. *See, e.g.,* 28 Pa. Code § 115.27; 49 Pa. Code § 16.61.

275.   Excela Health intentionally intruded upon the private concerns of Plaintiffs and Class Members in their personal health information.

276.   Plaintiffs and Class Members are current, former, or potential patients of Excela Health.

277.   Excela Health owes Plaintiffs and Class Members a duty of confidentiality.

278.    Despite its duty not to disclose personal health information, Excela Health disclosed personal health information of Plaintiffs and Class Members without their knowledge, consent, or authorization.

279.    The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Excela Health, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Excela Health, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Excela Health's website.

280.    Such disclosures constitute a substantial intrusion on the seclusion of Plaintiffs' and Class Members' private concerns.

281.    Excela Health's intentional disclosure of patients' personal health information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person.  Plaintiffs and Class Members reasonably expected that their personal health information would not be collected, used, and monetized by third party advertising companies

282.    Excela Health's disclosures of personal health information of Plaintiffs and Class Members were highly offensive to a reasonable person at least because such disclosures violated expectations of privacy that have been established by the Pennsylvania Constitution, the Pennsylvania Patient's Bill of Rights, and established social norms.  Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

283.    Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their personal health information and were accordingly entitled to

protection of this information against the acquisition and disclosure of their personal health information by unreasonable means.

284.    Excela Health owed a duty to Plaintiffs and Class Members to protect the confidentiality of their personal health information and not to share such information with Facebook, Google, and others for marketing purposes without the express written consent of Plaintiffs and Class Members.

285.    Excela Health obtained Plaintiffs' and Class Members' personal health information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent.    The deceitful method through which Excela Health obtained Plaintiffs' and Class Member's personal health information (i.e., lying to patients about how their personal health information would be used) would be objectionable to a reasonable person.

286.    The unauthorized acquisition, appropriation, and disclosure of Plaintiffs' and Class Members' personal health information would also be highly offensive to a reasonable person.

287.    The intrusion was into subject matter that was private and is entitled to be private. Plaintiffs and Class Members disclosed their personal health information to Excela Health with the understanding that it would only be used for their medical treatment and that such information would be kept confidential and protected from disclosure to third parties.    Plaintiffs and Class Members reasonably believed that such information would be kept private and would not be shared with Facebook without their authorization so that Facebook could target them with advertising.

288.    The disclosure of Plaintiffs' and Class Members' personal health information by Excela Health constitutes an unreasonable intrusion upon Plaintiffs' and Class Members'

04/11/2023 11:29 AM Westmoreland County    23CI01410

seclusion, as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

289.    Excela Health acted with a knowing mind when it intentionally disclosed Plaintiffs and Class Members' personal health information to Facebook, Google, and others.  Excela Health further invaded Plaintiffs' and Class Members' privacy by failing to implement adequate data security measures, despite its obligations to protect patients' personal health information.

290.    Acting with knowledge, Excela Health had notice and knew that its disclosure of Plaintiffs' and Class Members' personal health information would cause injury to Plaintiffs and Class Members.

291.    Given the nature of the personal health information that Excela Health disclosed to Facebook and others, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion is both a substantial invasion of Plaintiffs' and Class Members' privacy and would be (and in fact is) highly offensive to a reasonable person.

292.    Excela Health's breach caused Plaintiffs and Class Members, at minimum, the following damages:

   a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

   b.    Excela Health eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

   c.    Excela Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

04/11/2023 11:29 AM Westmoreland County    23CI01410

293.    Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

294.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Excela Health's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

295.    Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Excela Health as a result of its intrusions on Plaintiffs and Class Members' privacy.

296.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Excela Health's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights.  Such damages are needed to deter Excela Health from engaging in such conduct in the future.

297.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

WHEREFORE, Plaintiffs on behalf of themselves and their fellow Class Members respectfully requests this Honorable Court to enter judgment against Excela Health in excess of $1 million, together with all other compensatory, declaratory and injunctive relief, punitive damages, pre- and post-judgment interest, attorney's fees, costs of suit, and other such relief as the Court deems just and proper.

**COUNT III**
**Breach of Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

04/11/2023 11:29 AM Westmoreland County    23CI01410

298.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

299.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

300.    All conditions precedent to this action have been performed or occurred.

301.    "Doctors have an obligation to their patients to keep communications . . . completely confidential." *Haddad v. Gopal*, 2001 PA Super 317, ¶ 5, 787 A.2d 975, 981 (Pa. Super. Ct. 2001).

302.    As medical provider for Plaintiffs and Class Members, Excela Health owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Excela Health and Plaintiffs or Class Members.

303.    Excela Health designed its website for patients to exchange communications with Excela Health relating to providers, treatment, billing, medical conditions, and patient records.

304.    Excela Health's privacy policy assured Plaintiffs and Class Members that Excela Health would protect the confidentiality of their personal health information and not use them for marketing purposes without written authorization.

305.    Plaintiffs and Class Members who paid money to Excela Health reasonably believed and expected that Excela Health would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Excela Health failed to do so.  Plaintiffs and Class Members would not have purchased medical services from Excela Health if they knew that Excela Health would share their personal health information with Facebook, Google, and others without their knowledge or written consent.

306.    Plaintiffs and Class Members did not authorize, consent, know about, or take any action to indicate consent to Excela Health's conduct alleged herein.

307.    Excela Health's conduct described herein was intentional.

308.    Excela Health breached its duty of confidentiality by installing software code on its website that resulted in the disclosure of personal health information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment to Facebook and other third parties.

309.    Excela Health's breach caused Plaintiffs and Class Members the following damages:

    a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.    Excela Health eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

    c.    Excela Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

    d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Excela Health's duty to maintain the confidentiality of their personal health information; and

WHEREFORE, Plaintiffs on behalf of themselves and their fellow Class Members respectfully requests this Honorable Court to enter judgment against Excela Health in excess of $1 million, together with all other compensatory, declaratory and injunctive relief, punitive damages, pre- and post-judgment interest, attorney's fees, costs of suit, and other such relief as the Court deems just and proper.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

04/11/2023 11:29 AM Westmoreland County    23CI01410

04/11/2023 11:29 AM Westmoreland County    23CI01410

310.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

311.    Plaintiffs bring this claim on behalf of themselves and all members of the Class.

312.    Plaintiffs and Class Members conferred a benefit on Excela Health in the form of valuable sensitive medical information that Excela Health collected from Plaintiffs and Class Members under the guise of keeping this information private, and Excela Health appreciated this benefit.

313.    Excela Health collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Excela Health in the form of monetary compensation.

314.    Plaintiffs and the Class Members would not have used the Excela Health's services, or would have paid less for those services, if they had known that Excela Health would collect, use, and disclose this information to third parties.

315.    Excela Health unjustly retained those benefits at the expense of Plaintiffs and Class Members because Excela Health's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

316.    The benefits that Excela Health derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members.  It would be inequitable under unjust enrichment principles for Excela Health to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

317.    Excela Health should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Excela Health received, and such other relief as the Court may deem just and proper.

WHEREFORE, Plaintiffs on behalf of themselves and their fellow Class Members respectfully requests this Honorable Court to enter judgment against Excela Health in excess of $1 million, together with all other compensatory, declaratory and injunctive relief, punitive damages, pre- and post-judgment interest, attorney's fees, costs of suit, and other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a.    Certifying the Class and appointing Plaintiffs as the Class's representatives;

b.    Appoint the law firms of Bochetto & Lentz, P.C., Turke & Strauss, LLP, and Ahmad, Zavitsanos, & Mensing PLLC as class counsel;

c.    Finding that Excela Health's conduct as alleged herein was unlawful;

d.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Excela Health from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e.    Awarding statutory damages of $1,000 per violation to Plaintiffs and Class Members pursuant to 18 Pa. C.S.A. § 5725(a)(1);

f.    Imposing a constructive trust against Excela Health through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Excela Health;

g.    Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

69

04/11/2023 11:29 AM Westmoreland County    23CI01410

h.    Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j.    Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k.    Awarding costs of suit; and

l.    Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED**

*/s/ George Bochetto*
George Bochetto, Bar. No. 27783
David P. Heim, Bar. No. 84323
John A. O'Connell, Bar. No. 205527
Ryan T. Kirk, Bar No. 329492
BOCHETTO & LENTZ, P.C.
1524 Locust St.
Philadelphia, PA 19102
Tel: (215) 735-3900

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Weining Bai (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101

Samuel J. Strauss (*pro hac vice forthcoming*)
Raina C. Borrelli (pro hac vice forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775

Dated: April 10, 2023

**<u>CERTIFICATE OF FILING</u>**

 The undersigned hereby certifies that the foregoing Class Action Complaint has been filed using the Court's electronic case filing system on this 10th day of April 2023.


       *<u>/s/George Bochetto</u>*
       George Bochetto, Esquire

04/11/2023 11:29 AM Westmoreland County   23CI01410

**VERIFICATION**

I ███████████, hereby certify that I have read the foregoing and that the following is correct:

The facts set forth in the foregoing document are based upon information which I have furnished to counsel, as well as upon information which has been gathered by counsel and or/others acting on my behalf in this matter. The language of the document is that of counsel and not my own. I have read the document, and to the extent it is based upon information which I have given counsel, it is true and correct to the best of my knowledge, information and belief. To the extent the content of the document is that of counsel, I have relied upon such counsel in making this Verification. I hereby acknowledge that the facts set forth in the aforesaid document are made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

| 04 / 07 / 2023 |  |
|---|---|
| Date | |

04/11/2023 11:29 AM Westmoreland County    23CI01410

 Dropbox Sign                                    Audit trail

| | |
|---|---|
| **Title** | Excela Health \| Verification - ████████████ |
| **File name** | Verification - ████████████ |
| **Document ID** | 64c991f3b8792eb299fc1e62132c409202974da6 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**
**04 / 07 / 2023**
08:17:22 UTC-5

Sent for signature to ██████████████
from esignature@turkestrauss.com
IP: 172.220.116.88

**VIEWED**
**04 / 07 / 2023**
08:50:32 UTC-5

Viewed by ██████████████)
IP: 73.40.132.189

**SIGNED**
**04 / 07 / 2023**
08:51:42 UTC-5

Signed by ██████████████
IP: 73.40.132.189

**COMPLETED**
**04 / 07 / 2023**
08:51:42 UTC-5

The document has been completed.

Powered by ✖ Dropbox Sign

04/11/2023 11:29 AM Westmoreland County     23CI01410